IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| WILLIAM SQUIRES, JESSE BADKE, AHMED KHALIL, DOMINICK VISCARDI and MICHELLE NIDEVER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR CORP, TOYOTA MOTOR NORTH AMERICA, INC. and TOYOTA MOTOR SALES, U.S.A., INC.,<br><br>Defendants. | CIVIL ACTION NO.:_____<br><br>**CLASS ACTION COMPLAINT** |

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs William Squires, Jesse Badke, Ahmed Khalil, Dominick Viscardi, and Michelle Nidever (collectively, "Plaintiffs"), bring this action against Defendants Toyota Motor Corporation, Toyota Motor North America, Inc. and Toyota Motor Sales, U.S.A., Inc., (collectively "Defendants" or "Toyota"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

### INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of Fourth Generation Model Year 2016-17 Toyota Prius vehicles ("Class Vehicles").

2.      At all times relevant hereto, Defendants designed, manufactured, distributed, marketed, sold and warranted Class Vehicles containing one or more manufacturing and/or design defects that cause the Class Vehicles' windshields to unexpectedly crack in ordinary and

foreseeable driving conditions (hereinafter "Windshield Defect" or the "Defect").  The Windshield Defect can manifest at any time, while parked or operating at highway speeds, and requires windshield replacement in order to ensure Class members can safely operate Class Vehicles.

3.    The Windshield Defect presents a substantial safety risk.  Windshields are designed to contribute heavily to the overall structural integrity of automobiles: The rigidity and strength of the windshield is essential to maintaining the structure of the vehicle's cabin during collision.  The Windshield Defect greatly increases the risk of catastrophic injury in the event of a collision, particularly if the windshield has already chipped or cracked.  Moreover, although the Windshield Defect often manifests as a small chip, the crack typically grows and spreads, greatly impairing (if not completely inhibiting) visibility, and exposing vehicle occupants and fellow drivers to a substantial and unreasonable risk of physical harm.  The only means by which to remedy the Defect once it manifests, is to replace the windshield, often at considerable expense.

4.    The Windshield Defect also poses a substantial safety risk because it may impair critical safety features.  Many Class Vehicles come equipped with Safety Sense, a package of safety technologies that includes a pre-collision system, lane departure alert with steering assist, automatic high beams, and full-speed dynamic radar cruise control, features that require the Vehicles' front camera to function properly.  When the Windshield Defect manifests, the resulting chips and cracks may affect the camera's visibility, line of sight, and perceived orientation, impairing Safety Sense features and increasing the likelihood of an accident.

5.    Defendants have sold thousands of Class Vehicles without disclosing the Windshield Defect to Class members, despite longstanding knowledge of its existence.  Even when Class members submit their vehicles to Defendants for routine maintenance or to replace a cracked windshield while still under warranty, Defendants' authorized service technicians, at Defendants'

direction, deny that the Defect exists and assert the windshield cracked from ordinary wear, despite the fact that Defendants' New Vehicle Limited Warranty covers any "defects in materials or workmanship" in Class Vehicles for 36 months or 36,000 miles.

6.      Defendants instead hide behind a warranty provision excluding damage caused by "road debris (including stone chips)" and force Class members to pay out of pocket to replace Class Vehicle windshields (often more than once, as replacement windshields likewise are inherently defective), despite the fact that ordinary road debris of the type encountered and reported by several Plaintiffs and other Class members should not cause a properly manufactured and/or designed windshield to chip, let alone completely fail.  Plaintiffs and Class members are instead forced to pay out-of-pocket for repairs proximately caused by the Defect.

7.      The Windshield Defect also has deprived Plaintiffs and Class members of the use and enjoyment of their vehicles.  The Defect is so pervasive and widespread that replacement windshields for Class Vehicles are back ordered and unavailable from Defendants.  Defendants thus leave Class members with no choice but to drive Class Vehicles unsafe for operation for months on end while Defendants attempt to generate sufficient replacement windshields to repair vehicles in which the Defect has manifested.

8.      Despite notice and knowledge of the Defect from the numerous complaints received from customers, repair data provided by their dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records—including pre-sale durability testing—Defendants have concealed the Defect's existence, have not recalled Class Vehicles to repair the Defect, have not offered customers a suitable repair or replacement free of charge, and have not offered to reimburse customers who incurred out-of-pocket costs to repair the Defect.

9.      In short, as a result of Defendants' unfair, deceptive, and/or fraudulent business practices, current and former owners and/or lessees of Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money, property, and/or loss in value.  The unfair and deceptive trade practices Defendants committed were undertaken in a manner giving rise to substantial aggravating circumstances.

10.     Had Plaintiffs and Class members known of the Windshield Defect at the time of purchase, including the safety hazard posed by the Defect and the cost of repair, as well as the strong likelihood that the Defect would again manifest following repair, they would not have purchased Class Vehicles, would have paid much less for them and would have avoided the expense of repairing their windshields (and, often, on more than one occasion).  As such, Plaintiffs and Class members have not received the value for which they bargained when they purchased their Class Vehicles.

11.     Accordingly, Plaintiffs bring this action to redress Defendants' violations of various state consumer fraud statutes and the Magnuson-Moss Warranty Act, and Defendants' breach of express and implied warranties.

## JURISDICTION & VENUE

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

14.    This Court has personal jurisdiction over Defendants because they are headquartered and/or have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within this judicial district and throughout the United States.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are headquartered in this district, transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, there are one or more authorized Toyota dealers within this district, and Defendants have advertised in this district and received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district, including to members of the Class; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## PARTIES

*Plaintiffs*

**William Squires**

16.    Plaintiff William Squires ("Plaintiff Squires") is a citizen of the State of Georgia, and currently resides in Smyrna, Georgia.

17.    On or about August 8, 2016, Plaintiff Squires purchased a new 2016 Toyota Prius from Marietta Toyota, an authorized Toyota dealer in Marietta, Georgia, for personal, family and/or household use.    His vehicle bears Vehicle Identification Number ("VIN"): JTDKBRFU2G3527998.

18.    Prior to purchasing his vehicle, Plaintiff Squires test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker and spoke with Toyota sales

representatives concerning the vehicle's features, including available and standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the windshield was defective and susceptible cracking unexpectedly in ordinary and foreseeable driving conditions.

19.    On or around June 12, 2017, with only 9,400 miles on the odometer, Plaintiff Squires was operating his vehicle when he observed a miniscule object deflect off his windshield. Based on his driving experience, the object that deflected off his windshield was not of the type that typically affects a windshield, yet a dime-sized mark appeared.  When Plaintiff Squires returned to his vehicle later only an hour later to find that a large horizontal crack had developed, which spawned a second expansive crack within days.  The cracks impeded his ability to safely operate his vehicle.

20.    Plaintiff Squires thereafter contacted Marietta Toyota and Toyota Motor North America to seek warranty coverage for his vehicle.  Toyota refused his request.

21.    Marietta Toyota referred him to a third-party for windshield replacement. The third-party confirmed that the defective windshield would need to be replaced because the vehicle was unsafe to operate in its current condition, and mere repairs were impossible.  The third-party has quoted Plaintiff Squires $750 to replace his windshield. Due to the significant out-of-pocket expense associated with windshield replacement and Defendants' refusal to honor their New Vehicle Limited Warranty, Plaintiff Squires has been unable to repair his vehicle.

22.    The Defendants, their agents, dealers, or other representatives did not inform Plaintiff Squires of the Defect's existence at any time either prior to or following his purchase.

23.    Plaintiff Squires has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the out of

pocket loss associated with repair or replacement of the vehicle's windshield due to the Defect and the diminished value of his vehicle. Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Squires would not have purchased a Class Vehicle, would have paid much less for it or would have avoided the expense of repairing his windshield.

**Jesse Badke**

24.    Plaintiff Jesse Badke ("Plaintiff Badke") is a citizen of the State of Rhode Island, and currently resides in Westerly, Rhode Island.

25.    In or around July 2017, Plaintiff Badke purchased a new 2017 Prius Prime from Valenti Toyota, an authorized Toyota dealer in Westerly, Rhode Island, for personal, family and/or household use.    His vehicle bears the Vehicle Identification Number ("VIN"): JTDKARFP2H3026057.

26.    Prior to purchasing his vehicle, Plaintiff Badke test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker and spoke with Toyota sales representatives concerning the vehicle's features, including available and standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the windshield was defective and susceptible cracking unexpectedly in ordinary and foreseeable driving conditions.

27.    In or around September 2017, with only about 5,000 miles on the odometer, Plaintiff Badke was operating his vehicle when he heard what sounded like a Tic-Tac hit his windshield. Based on his driving experience, the noise did not sound like it was caused by the type of object that typically affects a windshield, yet a dime-sized mark appeared. Within a week the mark quickly grew into a crack spanning the entire windshield.

28.     Plaintiff Badke subsequently contacted Valenti Toyota to secure warranty coverage for his vehicle.  Valenti Toyota informed Plaintiff that Toyota would not cover the cost of repairs pursuant to its New Vehicle Limited Warranty, and confirmed that the windshield would need to be replaced because the vehicle was unsafe to operate in its current condition and mere repairs were impossible.

29.     Defendants' unwarranted refusal left Plaintiff Badke with no choice but to have Valenti Toyota replace the windshield, forcing Plaintiff Badke to pay a $500 deductible to Valenti Toyota.

30.     Then, on or around January 27, 2018, with only about 11,000 miles on the odometer, Plaintiff Badke was operating his vehicle when, again, he heard an object deflect off his windshield which, based on his driving experience, did not sound like an object capable of damaging a windshield.  Another dime-sized mark nevertheless appeared.

31.     Plaintiff Badke thereafter contacted Valenti Toyota, to secure warranty coverage for his vehicle.  Yet again, Valenti Toyota informed Plaintiff that Toyota would not cover the cost of repairs pursuant to its New Vehicle Limited Warranty, and confirmed that the windshield would need to be replaced because the vehicle was unsafe to operate in its current condition, and mere repairs were impossible.

32.     Due to the significant out-of-pocket expense associated with windshield replacement and Defendants' refusal to honor their New Vehicle Limited Warranty, Plaintiff Badke has been unable to repair his vehicle.

33.     The Defendants, their agents, dealers, or other representatives did not inform Plaintiff Badke of the Defect's existence at any time either prior to or following his purchase.

4543224.1

34.    Plaintiff Badke has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the out of pocket loss associated with repair or replacement of the vehicle's windshield due to the Defect and the diminished value of his vehicle. Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Badke would not have purchased a Class Vehicle, would have paid much less for it or would have avoided the expense of repairing his windshield.

**Ahmed Khalil**

35.    Plaintiff Ahmed Khalil ("Plaintiff Khalil") is a citizen of the State of California, and currently resides in Citrus Heights, California.

36.    In or around July 2016, Plaintiff Khalil purchased a new 2016 Prius from Roseville Toyota, an authorized Toyota dealer in Roseville, California, for personal, family and/or household use. His vehicle bears Vehicle Identification Number ("VIN"): JTDKBRFU1G3523523.

37.    Prior to purchasing his vehicle, Plaintiff Khalil test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker and spoke with Toyota sales representatives concerning the vehicle's features, including available and standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the windshield was defective and susceptible cracking unexpectedly in ordinary and foreseeable driving conditions.

38.    On or around January 20, 2018, with only 38,000 miles on the odometer, Plaintiff Khalil was operating his vehicle and heard a noise, but did not see an object deflect off of his windshield. Based on his driving experience, the noise did not sound like it was caused by the type of object that typically affects a windshield, yet a small dot appeared. The next day, Plaintiff Khalil noticed that the small dot had quickly grown into an almost foot long crack.

39.     Plaintiff Khalil thereafter contacted Roseville Toyota to secure warranty coverage for his vehicle.  However, Roseville Toyota informed Plaintiff that Toyota would not cover the cost of repairs pursuant to its New Vehicle Limited Warranty, and confirmed that the windshield would need to be replaced because the vehicle was unsafe to operate in its current condition and mere repairs were impossible.

40.     Defendant's unwarranted refusal left Plaintiff Khalil with no choice but to replace the windshield through Safelight Autoglass, forcing Plaintiff Khalil to pay a $100 deductible. Safelight confirmed that the windshield needed to be replaced and proceeded accordingly. Plaintiff Khalil paid $100 to Safelight.

41.     The Defendants, their agents, dealers, or other representatives did not inform Plaintiff Khalil of the Defect's existence at any time either prior to or following his purchase.

42.     Plaintiff Khalil has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the out of pocket loss associated with repair or replacement of the vehicle's windshield due to the Defect and the diminished value of his vehicle.  Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Khalil would not have purchased a Class Vehicle, would have paid much less for it or would have avoided the expense of repairing his windshield.

**Dominick Viscardi**

43.     Plaintiff Dominick Viscardi ("Plaintiff Viscardi") is a citizen of the State of Washington, and currently resides in Seattle, Washington.

44.     In or around March 2017, Plaintiff Viscardi purchased a new 2017 Prius from Toyota of Renton, an authorized Toyota dealer in Renton, Washington, for personal, family and/or

household use. His vehicle bears Vehicle Identification Number ("VIN"): JTDKARFU3H3533183.

45.     Prior to purchasing his vehicle, Plaintiff Viscardi test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker and spoke with Toyota Sales representatives concerning the vehicle's features, including available and standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the windshield was defective and susceptible cracking unexpectedly in ordinary and foreseeable driving conditions.

46.     On or around February 11, 2018, with only 18,000 miles on the odometer, Plaintiff Viscardi was operating his vehicle when he heard a noise, but did not see any object deflect off his vehicle. Based on his driving experience, the noise did not sound like one made by an object that typically affects a windshield. Upon completing his drive, Plaintiff Viscardi noticed a small crack in the windshield, which began to grow the next day and eventually reached twelve inches in length.

47.     Plaintiff Viscardi drove his vehicle to Safelight Autoglass seeking advice on the repairs necessary to fix his windshield. The Safelight representative informed Plaintiff Viscardi that the windshield would need to be replaced because the vehicle was unsafe to operate in its current state and mere repairs were impossible.

48.     Plaintiff Viscardi subsequently contacted Toyota of Renton to seek warranty coverage for his vehicle. However, Toyota of Renton informed Plaintiff that Toyota would not cover the cost of repairs pursuant to its New Vehicle Limited Warranty. Plaintiff Viscardi also contacted Toyota directly, but Toyota has yet to respond to him.

49.    Due to Toyota's unwarranted refusal, Plaintiff Viscardi was forced to have Safelight replace the defective and cracked windshield.  His new windshield also will need to be calibrated by Toyota following installation.

50.    Plaintiff Viscardi scheduled an appointment with Safelight to replace the defective and cracked windshield on or about February 16, 2018, but Safelight needed to reschedule the appointment because it was unable to secure the replacement windshield.  Safelight was unable to provide an exact date or an estimated timeframe for the repair.  Safelight confirmed that Plaintiff Viscardi will need to pay $432.20 to Safelight for the replacement.

51.    The Defendants, their agents, dealers, or other representatives did not inform Plaintiff Viscardi of the Defect's existence at any time prior to or following his purchase.

52.    Plaintiff Viscardi has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the out of pocket loss associated with repair or replacement of the vehicle's windshield due to the Defect and the diminished value of his vehicle.  Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Viscardi would not have purchased a Class Vehicle, would have paid much less for it or would have avoided the expense of repairing his windshield.

**Michelle Nidever**

53.    Plaintiff Michelle Nidever ("Plaintiff Nidever") is a citizen of the State of California, and currently resides in Irvine, California.

54.    In or around April 2017, Plaintiff Nidever purchased a new 2016 Prius from Tustin Toyota, an authorized Toyota dealer in Tustin, California, for personal, family and/or household uses.  Her vehicle bears Vehicle Identification Number ("VIN"): JTDKARFU6G3012652.

-12-

55.     Prior to purchasing her vehicle, Plaintiff Nidever test drove the vehicle, viewed advertisements for the vehicle, reviewed the vehicle's window sticker and spoke with Toyota sales representatives concerning the vehicle's features, including available and standard safety features. Neither the test drive, the advertisements, the window sticker nor the sales representatives disclosed or revealed that the windshield was defective and susceptible cracking unexpectedly in ordinary and foreseeable driving conditions.

56.     On or around February 10, 2018, with only 23,000 miles on the odometer, Plaintiff Nidever was operating her vehicle when she heard a noise, but did not see an object deflect off of her windshield. A small crack formed. Based on her driving experience, the noise did not sound like one made by an object of the type that should affect a windshield. The crack spread to almost twelve inches long as she was driving, and within a few days quickly grew to almost 18 inches and spread across her windshield.

57.     Plaintiff Nidever thereafter contacted Tustin Toyota to secure warranty coverage for her vehicle. However, Tustin Toyota informed Plaintiff that Toyota would not cover the cost of repairs pursuant to its New Vehicle Limited Warranty, and confirmed that the windshield would need to be replaced because the vehicle was unsafe to operate in its current condition and mere repairs were impossible.

58.     Defendants' unwarranted denial forced Plaintiff Nidever to replace the windshield on her own. Plaintiff Nidever received several quotes for windshield replacement and ultimately tendered the vehicle to Safelight Autoglass for repairs. Safelight confirmed that the windshield would need to be replaced because the vehicle was unsafe to operate in its current state and mere repairs were impossible. Plaintiff Nidever paid Safelight Autoglass a $500 deductible in connection with the repairs.

4543224.1

59.     The Defendants, their agents, dealers, or other representatives did not inform Plaintiff Nidever of the Defect's existence at any time either prior to or following her purchase.

60.     Plaintiff Nidever has suffered an ascertainable loss as a result of Defendants' omissions and misrepresentations relating to the Defect, including but not limited to the out of pocket loss associated with repair or replacement of the vehicle's windshield due to the Defect and the diminished value of his vehicle.  Had Toyota refrained from making the misrepresentations and omissions alleged herein, Plaintiff Nidever would not have purchased a Class Vehicle, would have paid much less for it or would have avoided the expense of repairing her windshield.

**Defendants**

61.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States, and design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including Class Vehicles.

62.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation, and the parent corporation of Toyota Motor Sales, U.S.A., Inc.  TMC, through its various subsidiaries and affiliates, designs, manufactures, markets, distributes and warrants Toyota automobiles throughout the fifty States.

63.     Defendant Toyota Motor North America, Inc. ("TMNA") is a California corporation headquartered in Plano, Texas as of May 2017.  TMNA operates as a wholly owned subsidiary of TMC, and is the parent company of Toyota Motor Sales, U.S.A., Inc.  TMNA oversees government and regulatory affairs, energy, economic research, philanthropy, corporate advertising and corporate communications for all of TMC's North American operations.

64.     Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a California corporation headquartered in Plano, Texas.  TMS is TMC and TMNA's U.S. sales and marketing division,

which oversees sales and other operations across the United States. TMS distributes Toyota parts and vehicles, which are then sold through Defendants' network of dealers. Money received from the purchase of a Toyota vehicle from a dealership flows from the dealer to TMS.

65.    TMC, TMNA and TMS are collectively referred to in this complaint as "Defendants" or "Toyota" unless identified separately.

66.    TMC, TMNA and TMS sell Toyota vehicles through a network of dealerships that are the agents of TMC, TMNA and TMS. As detailed below, TMC, TMNA and TMS exercise substantial control over these dealerships, and those dealerships in turn represent themselves to the public as exclusive representatives and agents of TMC, TMNA and TMS.

67.    There exists, and at all times herein mentioned, a unity of ownership between TMC, TMNA, and TMC and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants, would, under the circumstances set forth in this Complaint, sanction fraud or promote injustice.

68.    Upon information and belief, Defendants TMNA and TMS communicate with Defendant TMC concerning virtually all aspects of the Toyota products TMNA and TMS distribute within the United States, including appropriate repairs for pervasive defects, and whether Toyota will cover repairs to parts and assemblies customers claim to be defective. Toyota's decision not to disclose the Defect to Plaintiffs or the Class, or to cover repairs to the same pursuant to an extended warranty or goodwill program, was a decision made jointly by TMC, TMNA and TMC.

69.    TMS oversees Toyota's National Warranty Operations (NWO), which, among other things, reviews and analyzes warranty data submitted by Toyota's dealerships and authorized

technicians in order to identify defect trends in vehicles. Upon information and belief, Toyota dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendants decide to audit the dealership. NWO collects this information, makes it available to other Toyota divisions, and assists Toyota in determining whether particular repairs—such as those made to Plaintiffs' and the Class' windshield—are covered by an applicable Toyota warranty or are indicative of a pervasive defect.

70.    Toyota also jointly designs, determines the substance of, and affixes to its vehicles the window stickers visible on every new Toyota vehicle offered for sale at its authorized dealerships, including those omitting mention of the Defect and reviewed by Plaintiffs prior to purchasing Class Vehicles. Toyota controls the content of these window stickers; its authorized dealerships have no input with respect to their content. Vehicle manufacturers like Toyota are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231-1233, et seq. In fact, the Act specifically prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

71.    Toyota developed the marketing materials to which Plaintiffs and the Class were exposed, owner's manuals, informational brochures, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Defect.

72.     Toyota also employs a Customer Experience Center, the representatives of which are responsible for fielding customer complaints and monitoring customer complaints posted to Toyota or third-party Web sites, data which informs NWO's operations, and through which Toyota acquires knowledge of defect trends in its vehicles.

## TOLLING OF STATUTES OF LIMITATIONS

73.     Any applicable statute(s) of limitations have been tolled by Toyota's knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

74.     In addition, even after Plaintiffs and Class members contacted Toyota and/or its authorized dealers for vehicle repairs necessitated by the Defect, they were routinely told by Toyota and/or through its dealers that the Class Vehicles were not defective and the Windshield Defect is a normal "wear" condition, despite the propensity of the windshields installed in Class Vehicles to crack in ordinary and foreseeable driving conditions.

75.     Toyota was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of Class Vehicles, that the Defect is the result of poor manufacturing processes, workmanship and/or design, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles.  As a result of Toyota's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**The Windshield Defect**

76.     Toyota is a multinational corporation with hundreds of thousands of employees worldwide.  The Toyota Prius is one of Defendants' most popular U.S. offerings, and one of the

most popular hybrid cars in the United States. From 2016 through the present, Toyota has sold more than 200,000 Fourth Generation Class Vehicles, composed of Model Years 2016-17.

77.     Like many of its vehicles, Toyota emphasizes in marketing and promotional materials the Prius' safety features and Toyota's brand-wide focus on vehicle safety. For instance, a brochure for the 2016 MY Prius[1] touts the vehicle's comprehensive safety systems as providing "peace of mind for the journey ahead". A television commercial for the 2016 MY Prius that first aired during the 2016 Super Bowl[2] and a contemporaneous print campaign[3] also highlight Class Vehicles' safety-related attributes, including the pre-collision system. Television commercials for the 2017 MY Prius similarly highlight the vehicle's safety features.[4]

78.     Every 2016 and 2017[5] MY Prius also comes equipped with the Star Safety System, which includes enhanced vehicle stability control, traction control, anti-lock brakes, electronic brake-force distribution, brake assist, and smart stop technology. Indeed, Toyota's marketing assures consumers that "with eight standard airbags, plus technologies like available Safety Connect, you can rest assured that Prius has got your back." [6]

79.     Due to a manufacturing and/or design defect, however, the windshields installed in Class Vehicles chip and crack in ordinary and foreseeable driving conditions, or even while parked. In fact, as reflected in the consumer complaints transcribed below, Class members often report windshields cracking for no reason at all, including when secured in a covered garage

---

[1]     *See* Toyota's 2016 Prius E-Brochure (attached as Exhibit A), at pp. 14, 16.
[2]     Toyota of San Bernardino, Heck on Wheels, YOUTUBE (February 4, 2016), https://www.youtube.com/watch?v=11gGzW6V3Sg (at 1:00 into the commercial).
[3]     Toyota's Protective Instinct print ads (attached as Exhibit B).
[4]     Toyota USA, *Skydiver: Toyota Prius with Toyota Safety Sense Standard-Crash Test Dummies*, YOUTUBE (April 6, 2017), https://www.youtube.com/watch?v=OU1R0lUzEks.
[5]     Toyota's 2017 Prius E-Brochure (attached as Exhibit C), at pp. 13, 15.
[6]     *Id.* at p. 15.

4543224.1

overnight, exposing Class members, vehicle occupants and other drivers to a substantial and unreasonable risk of physical harm, contrary to Toyota's safety-centric marketing campaign.

80.    The Windshield Defect renders the windshield installed in Class Vehicles much weaker and more vulnerable to the normal, and expected, wear and tear of operating an automobile. Windshields are not manufactured or designed to chip or crack in ordinary and foreseeable driving conditions, particularly at the rate at which Class members report windshield failure in Class Vehicles.

81.    Plaintiffs and Class members also report that although the Defect initially manifests as small chips in the windshield, the chips quickly grow and spread across the windshield.  Due to the rate and extent at which cracking accelerates, windshield repair is not a viable option.  Plaintiffs and Class members instead have no choice but to replace the entire windshield.

82.    The Windshield Defect imposes significant and unexpected safety risks on vehicle owners.  A windshield crack compromises the vehicle's structural integrity, increasing the risk of injury in a front-end collision or rollover, and the risk of ejection from the vehicle following impact, and can render ineffective airbag deployment and greatly impair visibility, if not inhibit it completely.  Toyota's refusal to disclose the Defect to Class members at the point-of-sale or otherwise is unconscionable and unacceptable.

83.    Class members must replace failed windshields with original equipment manufacturer (OEM) parts—which typically are more expensive than aftermarket or generic windshields sold by third parties—in order to preserve various vehicle features, including early collision detection systems equipped in all MY 2017 Vehicles, and/or a Heads-Up Display ("HUD") system.

84.    The Windshield Defect is so pervasive, however, that Toyota has experienced a shortage of replacement windshields, which are on a months-long backorder.  Class members wait months to replace their windshields following manifestation of the Defect, and in the interim are forced to choose between operating Class Vehicles that cannot be driven safely or to forego use of their Class Vehicles entirely, an illusory choice for Plaintiffs and Class members who rely on their vehicles to safely transport them and loved ones to school or work.

85.    Unfortunately for Plaintiffs and Class members, the repairs for which they often wait months are ineffective; merely replacing the windshield does not remedy the Defect.  Many Class members, including certain Plaintiffs and many others whose complaints are transcribed below, have replaced their windshields following manifestation of the Defect only for the replacement windshield to crack and fail a short time later.

86.    The Windshield Defect also greatly impairs critical Safety Sense features for which Class members bargained when they purchased a Class Vehicle.  In marketing for 2016 MY Prius models, Toyota advertised the new "Toyota Safety Sense" vehicle safety system as a package of safety technologies that includes a pre-collision system, lane departure alert with steering assist, automatic high beams, and full-speed dynamic radar cruise control.  Toyota touted Safety Sense as a set of "comprehensive features [that] create in-the moment safety designed to support your awareness and decision-making on the road."[7]  Every 2017 Prius comes standard with Toyota Safety Sense further demonstrating Toyota's commitment to safety and the marketing of their vehicles' safety technology.

---

[7]    Exhibit A at p. 14.

87.    In order for Safety Sense to function, the front camera installed in certain Class Vehicles must be properly calibrated and oriented along the horizontal axis in order to ensure each driving support system operates correctly.[8] The front camera operates by recognizing differences in contrast, which in turn depends on the manner in which the camera perceives lighting and objects within its line of sight.[9] If the cracks that invariably form as a direct result of the Windshield Defect interfere with the camera's optical functionality, the camera cannot accurately determine vehicle positioning and orientation or identify nearby vehicles, thereby impairing Safety Sense and its associated driving support systems and increasing the likelihood of a collision.

88.    Adding insult to injury, for owners of vehicles equipped with a HUD system or Safety Sense, windshield replacement is a costly, two-step process; Toyota's authorized technicians must recalibrate the HUD system and any front facing safety sensors or cameras following windshield replacement, at Class members' expense.

**Toyota's Warranty-Related Practices**

89.    Toyota issues a "New Vehicle Limited Warranty" to each individual who purchases a Class Vehicle, as well as part-specific limited warranties.

90.    In its New Vehicle Limited Warranty, Toyota agrees to repair defects reported within the earlier of three years or 36,000 miles, so long as the vehicle owner tenders the vehicle to a Toyota authorized dealer for repair. The Warranty Information Booklet included with all Class Vehicles provides that:

> This warranty covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by

---

[8]    T-SB-0184-17 (available at http://media.fixed-ops.com/Toy_ServiceBulletins/sb0184t17.pdf) (last visited Feb. 27, 2018).
[9]    *Id.*

Toyota… Coverage is for 436 months or 36,000 miles, whichever occurs first…"[10]

The New Vehicle Limited Warranty does not limit Toyota's obligations thereunder only to defects present at the time of delivery, nor does it specifically exclude coverage for windshield repair or replacement.[11]

91.    In the Warranty Information Booklet, Toyota explains the requirements for obtaining warranty service: "To obtain warranty service in the United States…take your vehicle to an authorized Toyota Dealership."[12]

92.    Due to Toyota's knowledge of the Windshield Defect's existence, Toyota knows that the windshield cracking experienced by Prius owners is the result of a defect in materials, design and/or workmanship.  Nevertheless, Toyota refuses to repair at no cost Class Vehicles that still are within the New Vehicle Warranty period, or shortly outside of it.

93.    Toyota instead evades its warranty obligations by claiming that the New Vehicle Limited Warranty excludes windshield repair or replacement.  Although many Class members assert their windshields inexplicably and spontaneously cracked—or cracked as a result of the stresses to which windshields are exposed in ordinary and foreseeable driving conditions, which could not and should not cause a windshield to fail—Toyota's authorized technicians typically assert, at Toyota's direction, that "road debris" likely caused the crack, excluding the vehicle from warranty coverage.

94.    But in light of the alarming rate at which the windshields on Class Vehicles have cracked and the massive shortfall of replacement windshields, Toyota cannot credibly claim that

_____

[10]    Excerpts from Toyota Prius 2017 Warranty & Maintenance Guide (attached as Exhibit D), at p. 14.
[11]    *Id*. at 14-16.
[12]    *Id*. at 33.

Prius windshields are anything but inherently defective and within the scope of the New Vehicle Limited Warranty.  The windshields installed in Class Vehicles, due either to a defect in design, workmanship or in the sub-standard materials from which Toyota constructs the windshields, simply cannot withstand the forces to which vehicles are exposed in ordinary and foreseeable driving conditions.  Toyota knows or should know that the windshields installed in Class Vehicles—windshields on which the vehicles' structural integrity depends in the event of a collision or roll over—are inherently defective and should be covered by Toyota's warranty.

**<u>Toyota's Knowledge of the Defect</u>**

95.     Toyota has known since at least 2016, if not earlier, that Prius vehicles contain defective windshields.  Indeed, the Internet is replete with examples of blogs and other Websites where consumers have complained of the Windshield Defect within Class Vehicles.  Upon information and belief, Toyota, through (1) their backlog of orders for replacement windshields, (2) records from the National Highway traffic Safety Administration ("NHTSA"), (3) their own records of customers' complaints, (4) dealership repair records, (5) warranty and post-warranty claims, (6) internal durability testing, and (7) other various sources, was well aware of the Windshield Defect but failed to notify consumers of the nature and extent of the problems with the windshields installed in Class Vehicles, or provide any adequate remedy.

      **A.      Complaints Lodged with NHTSA.**

96.     There exist a large number of relevant customer complaints, many of which indicate Toyota was made aware of the Windshield Defect when affected vehicles were submitted for service, on the NHTSA Office of Defect Investigations ("ODI") Website, www.safercar.gov, as well as other customer forums and blogs addressing car defect and safety issues.  Yet Toyota has not taken any steps to recall the Class Vehicles and repair the Windshield Defect, or to reimburse customers who have incurred expenses in connection with repairing the Windshield Defect.

-23-

97.     Federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.  See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

98.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.*   Thus, Toyota knew or should have known of the many complaints about the Windshield Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints that alerted, or should have alerted, Toyota to the Windshield Defect.

99.     The following are but a few examples of the many complaints concerning the Windshield Defect available through NHTSA ODI's Website, www.safercar.gov.  The complaints reveal that Defendants, through their network of dealers and repair technicians, were made aware of the Defect.   In addition, the complaints indicate that despite having knowledge of the Windshield Defect and the exact vehicles affected thereby, Defendants and their agents will neither disclose the Windshield Defect nor agree to make repairs under warranty as required by Toyota's New Vehicle Limited Warranty.  The comments reproduced below are but a sampling of available complaints:

| Model Year | Complaint Date | Comments |
|---|---|---|
| 2016 | 10/24/2016 | MY WINDSHIELD RANDOMLY CRACKED AND LOOKING ON-LINE THIS SEEMS TO BE A COMMON OCCURRENCE ON THE PRIUS 4TH GENERATION VEHICLES. |
| 2016 | 01/14/2017 | WINDSHIELD CRACKED 12+ INCHES OVERNIGHT WITH NO CAUSE. VEHICLE WAS PARKED IN GARAGE. CRACK HAS SINCE GROWN TO 20+ INCHES |
| 2016 | 02/25/17 | ON MY WAY TO WORK, WHILE SWITCHING LANES FROM LEFT TO RIGHT, MY VEHICLE WINDSHIELD WAS HIT WITH A SMALL ONCOMING PEBBLE ROCK THAT FELL FROM A SEMI-TRUCK THAT WAS APPROXIMATELY 125 FEET IN FRONT OF ME. I COULD NOT AVOID IT SINCE IT WAS A "LAST SECOND" SITUATION. MY CURRENT SPEED WAS 50 MPH IN A 70 MPH ZONE BECAUSE TRAFFIC IN THE LEFT LANE WAS MOVING SLOWER THAT IT SHOULD HENCE WHY I MOVED FROM THE LEFT TO THE RIGHT LANE. WHAT I AM TRYING TO REPORT IS THAT I BELIEVE AS WELL AS MANY OTHER 2016/2017 TOYOTA PRIUS OWNERS WHO HAVE CRACKED WINDSHIELDS, IS THAT TOYOTA IS USING WINDSHIELD GLASS THAT IS NOT UP TO CURRENT SAFETY STANDARDS. JUDGING BY THE CRACK IN MY WINDSHIELD, WHICH IS NOW WELL OVER A FOOT LONG, YOU CAN TELL HOW MUCH THINNER THE GLASS IS COMPARED TO OTHER CURRENT MAKE AND MODEL VEHICLES. I AM NOT SURE IF THIS IS DUE TO GAINING WEIGHT SAVINGS WHICH IN TURN WOULD GIVE A FEW EXTRA MPG OR NOT FOR A HYBRID VEHICLE, BUT I BELIEVE THIS NEEDS TO BE LOOKED INTO BECAUSE WINDSHIELDS FOR A VEHICLE LIKE THIS ARE EXTREMELY COSTLY. UPWARDS OF $690 FROM DIFFERENT VENDORS OR $1500 FROM A TOYOTA DEALER. I HAVE OWNED 5 CARS IN THE PAST, THE TOYOTA PRIUS IS NUMBER 6, AND ALL OF THE PAST 5 VEHICLES HAVE BEEN HIT EVEN HARDER WITH BIGGER ROCKS THAN THE PRIUS WAS ON THE WINDSHIELD WITH NO CRACKS OR CHIPS. I DO HOPE THIS IS LOOKED INTO BEFORE I START |

| | | |
|---|---|---|
| | | PAYING HIGH AMOUNTS OF MONEY FOR NEW WINDSHIELDS. |
| 2016 | 04/07/2017 | I HAVE A 3 FT. LONG CRACK IN MY WINDSHIELD THAT OCCURRED APPROXIMATELY A MONTH AND A WEEK AGO. IT HAS BECOME A SAFETY RISK TO DRIVE AS THE CRACK REFLECTS SUNLIGHT IN MY EYES WHEN DRIVING DURING THE DAY, OR AT THE END OF THE WORK DAY DURING SUNSET. TOYOTA IS UNABLE TO PROVIDE A WINDSHIELD REPLACEMENT. |
| 2016 | 04/17/2017 | THE CAR'S WINDSHIELD SEEMS TO BE SOFTER THAN PREVIOUS MODELS. I HAD THE WINDSHIELD COMPLETELY REPLACED A FEW MONTHS AGO, AFTER A FAILED REPAIR OF A LARGE CHIP. A CHIP REPAIR WAS DONE ON THE NEW WINDSHIELD ON APRIL 7TH. IN THE CAR WASH LAST FRIDAY, I NOTICED SEVERAL SMALL CHIPS IN THE WINDSHIELD. MY HUSBAND DRIVES A 2016 TOYOTA HIGHLANDER. HIS WINDSHIELD WAS ALSO REPLACED EARLY THIS YEAR. HE NOW HAS A SIZEABLE CHIP IN THE NEW WINDSHIELD. IT SEEMS THAT THERE IS A PROBLEM WITH 2016 TOYOTA WINDSHIELDS, NOT JUST IN THE PRIUS, BUT IN OTHER MODELS AS WELL. |
| 2016 | 05/15/2017 | THE WINDSHIELD CRACKED WITHIN 3 DAYS OF PURCHASING THE CAR AS BRAND NEW. I DIDN'T HEAR A ROCK HITTING IT AND I CAN'T SEE AN IMPACT PATTERN. I WOKE UP ONE MORNING AND THE CRACK WAS OVER A FOOT AND IT SPREAD FROM THERE INTO MULTIPLE CRACKS. THERE WAS NO CHANCE TO GET THE WINDSHIELD REPAIRED AT ALL AND IT NEEDED TO BE REPLACED BUT I DON'T HAVE THE 1300 DOLLARS THAT THE DEALER IS SAYING IT TAKES TO GET IT REPLACED AND THEY CLAIM IT WAS A ROCK AND NOT A DEFECT WHICH I'M DISPUTING. |
| 2016 | 07/11/2017 | IN EARLY JUNE I WALKED OUT FROM A BOOKSTORE IN OCEANSIDE, CA TO FIND MY WINDSHIELD, ON MY PARKED/STATIONARY PRIUS, HAD ABOUT AN 8 TO 10 INCH CRACK ON THE PASSENGER SIDE. I FILED AN INSURANCE CLAIM WITH AAA AND FOUND THAT WHEN I ATTEMPTED TO USE TWO DIFFERENT VENDORS FOR REPAIR AS WELL AS THE CARLSBAD, CA DEALERSHIP, EACH ONE CONVEYED TO ME THAT THERE IS A NATIONAL SHORTAGE ON PRIUS WINDSHIELDS. THE CRACK |

| 2016 | | HAS EXPANDED ON ITS OWN AT THIS TIME, MAKING THE CAR UNSAFE TO DRIVE. IT IS ALMOST ACROSS THE ENTIRE WINDSHIELD. I'M RENTING A CAR, BUT MY RENTAL WILL EXPIRE ON JULY 20TH. IF I RENEW THE RENTAL, IT WILL BE AT MY EXPENSE. ACCORDING TO THE CARLSBAD TOYOTA DEALERSHIP, THE REPLACEMENT WINDSHIELD WILL NOT BE AVAILABLE UNTIL AUGUST 8TH WHICH IS NEARLY A MONTH AWAY FROM NOW. THE CLAIM WAS REPORTED IN EARLY JUNE. DUE TO THIS IMMENSE AMOUNT OF INCONVENIENCE CAUSED BY THIS NATIONAL SHORTAGE, I WOULD APPRECIATE IT IF TOYOTA CORPORATION WOULD TAKE RESPONSIBILITY AND PAY FOR MY RENTAL CAR UNTIL THIS ISSUE IS RESOLVED--STARTING JULY 21ST. FINALLY, PERHAPS THERE NEEDS TO BE A RECALL.(excluded contact information of customer) |
|------|------------|---|
| 2016 | 07/17/2017 | WHILE DRIVING APPROXIMATELY 60 MPH ON THE FREEWAY, A VERY SMALL ROCK HIT MY WINDSHIELD AND CREATED A CRACK THAT WAS ABOUT 1 INCH BY 1 INCH IN SIZE. MERELY TWO DAYS LATER, I WOKE UP TO FIND THE CRACK HAD EXTENDED 3/4 OF THE WAY ACROSS MY ENTIRE WINDSHIELD AND COMPLETELY UP AND DOWN THE ENTIRE HEIGHT OF THE WINDSHIELD - JUST OUT OF THE BLUE, OVERNIGHT. IT'S NOW DIFFICULT TO PROPERLY SEE OUT OF THE WINDSHIELD AS ONE OF THE CRACKS RUNS RIGHT IN MY LINE OF VISION WITH THE ROAD. FOR SOMETHING SO MINOR TO CREATE SUCH A MAJOR EFFECT ON MY CAR THAT IS NOT QUITE 14 MONTHS OLD IS QUITE DISTURBING. |
| 2016 | 08/09/2017 | I WAS DRIVING ON I-40W WHEN I GOT A ROCK CHIP ON MY WIND SHIELD. THE NEXT DAY WHILE DRIVING I NOTICED A CRACK IN MY WINDSHIELD, NOT ASSOCIATED WITH THE ROCK CHIP, STARTING ON THE LEFT BOTTOM OF THE WINDSHIELD AND CURVING UP TO THE RIGHT FOR ABOUT 6". THIS CRACK KEPT PROGRESSING DAILY AND NOW EXTENDS APPROX. 3/4 OF THE WAY ACROSS THE WINDSHIELD. THE WINDSHIELD FOR MY CAR IS ON NATIONAL BACKORDER WITHOUT ANY IDEA AS TO HOW LONG IT WILL TAKE TO GET IT IN.I WENT ONLINE AND IT APPEARS FROM THE NUMBER OF PEOPLE DISCUSSING IT, IT APPEARS TO BE WIDESPREAD AND PROBABLY THE REASON FOR |

| | | |
|---|---|---|
| | | THE BACK ORDER. WITH THE NUMBER OF COMPLAINTS I'VE BREADTHS SHOULD BE A RECALL. AS A SIDE NOTE WHENEVER MY CAR'S VIN # IS RUN IT COMES UP AS A 2016 TOYOTA PRIUS C NOT A 2016 PRIUS FOUR TOURING. THE TECH AT THE AUTO GLASS SHOP TOLD ME THAT THIS HAS BEEN A RECURRING PROBLEM. |
| 2016 | 08/15/2017 | WINDSHIELD CHIPPED EASILY AND DEVELOPED INTO VERY LONG CRACK AFTER SHORT PERIOD OF TIME. POSSIBLE SOURCE OF INITIAL CRACK WAS UNSEEN PEBBLE/DEBRIS THAT HIT THE WINDSHIELD DURING FREEWAY DRIVING. REPLACEMENT CLAIMED THROUGH AUTO INSURANCE. THE RAPID AND GREAT INCREASE IN LENGTH OF CRACK IS VERY CONCERNING. MATERIAL DURABILITY MAY BE IN QUESTION. |
| 2016 | 09/15/2017 | I WAS DRIVING TO WORK ON THE HIGHWAY AND A SMALL ROCK HIT MY WINDSHIELD. WITHIN MINUTES, A 6 INCH CRACK HAD DEVELOPED. BY THE TIME I ARRIVED AT WORK (ABOUT 15 MINUTES LATER), THE CRACK HAS EXTENDED TO OVER A FOOT. I CALLED A LOCAL TOYOTA DEALERSHIP AND ASKED IF ANY KNOWN DEFECTS EXISTED. I WAS TOLD NO RECALLS EXISTS FOR MY WINDSHIELD. SPOKE WITH MY INSURANCE AGENT AND REFERRED TO SAFELITE AUTOGLASS FOR REPLACEMENT, SINCE IT COULD NOT BE REPAIRED. THE NEXT MORNING, I DROVE CAR TO WORK AGAIN AND NOTICED CRACK HAS PROGRESS A FEW MORE INCHES OVERNIGHT. BY THE TIME I LEFT WORK, THE LATERAL EXTENDING CRACK HAS NOW STARTED EXTENDING TOWARDS THE MIDDLE OF THE WINDSHIELD, FORMED A JAGGED C-SHAPE. VISIBILITY WAS NOW LIMITED FROM THE CRACK AND FROM THE GLARE FROM THE SUNLIGHT REFLECTING OFF THE CRACKS. I CALLED SAFELITE AND WAS TOLD THAT THE ONLY REPLACEMENT WINDSHIELD WAS AN TOYOTA OEM, BUT THAT IT WAS ON BACKORDER FOR ANOTHER 3 WEEKS AND AT A COST OF ALMOST $800. FEARING ANOTHER POTENTIALLY DANGEROUS DRIVING CONDITION, I DID NOT ATTEMPT TO DRIVE MY CAR UNTIL THE WINDSHIELD WAS REPLACED. TODAY, I WAS READING PRIUSCHAT WEBSITE AND FOUND THAT MY CASE IS CERTAINLY NOT AN ISOLATED INCIDENT. I AM CONCERNED NOW THAT SINCE I |

| | | |
|---|---|---|
| | | REPLACED MY WINDSHIELD WITH AN TOYOTA OEM PART, I AM AGAIN SUBJECTED TO REPEAT DANGER VEHICLE CONDITION AND ADDITIONAL HIGH COST OF REPLACEMENT. |
| 2016 | 09/24/2017 | I HAD A VERY SMALL PEBBLE HIT MY WINDSHIELD WHILE DRIVING SLOWLY ON A RESIDENTIAL STREET. THE INITIAL IMPACT CAUSED SEVERAL SIGNIFICANT CRACKS RUNNING LENGTHWISE AND WIDTHWISE ACROSS MY WINDSHIELD INSTEAD OF JUST STARING OR PITTING AS TRADITIONALLY OCCURS. THIS IS MY THIRD PRIUS AND I HAVE NEVER EXPERIENCED A WINDSHIELD RESPONDING THIS WAY. IT APPEARS ONLINE THAT THIS HAS BECOME A VERY COMMON PROBLEM AND IT IS EXTREMELY COSTLY SINCE THEY CURRENTLY DO NOT HAVE AN AFTERMARKET AVAILABLE. AS WELL AS REQUIRING $600+ RECALIBRATION. I AM EXTREMELY DISAPPOINTED IN TOYOTA.<br><br>I AM CONCERNED THAT I AM GOING TO PAY $1500 TO GET THIS FIXED (SINCE MY INSURANCE USES MY DEDUCTABLE) ONLY FOR IT TO BREAK AGAIN DUE TO A MINOR INSTANCE (AS MANY HAVE COMPLAINED ONLINE). MY UNDERSTANDING IS THAT THE NEW WINDSHIELD IS THINNER/ LIGHTER FOR MPG. IS THIS NOT COVERED ON SOME SORT OF WARRANTY OR RECALL? I'M VERY UPSET THAT THIS HAS OCCURRED AND HAVE ALWAYS BEEN EXTREMELY LOYAL TO TOYOTA, IM AT A POINT WHERE I JUST WANT TO DRIVE WITH IT CRACKED TO AVID HAVING TO FIX FUTURE CRACKED WINDSHIELDS. |
| 2017 | 03/14/2017 | A SMALL ROCK HIT THE WINDSHIELD AND IT BROKE, SEEMS TO BE A WEAK SPOT. I WAS DRIVING ON THE HIGHWAY. |
| 2017 | 05/29/2017 | TRAVELING EAST ON THE 10 THROUGH PHOENIX AZ, MY WINDSHIELD WAS HIT BY SOMETHING SO SMALL I COULDN'T SEE IT. CAUSED A STAR LESS THAN 1/3" BUT ALSO A WINDING CRACK ALMOST 1 FT. LONG. THE REAL PROBLEM IS THAT EVERY DAY WHEN I COME OUT TO MY CAR, THE CRACK HAS GROWN IN A SNAKING PATTERN. IT DOES NOT GROW AT ALL WHILE DRIVING. I PERIODICALLY CHECK IT WHILE DRIVING. TODAY THE CRACK GREW OVER 1 FT. IN LENGTH OVER THE COURSE OF THE MORNING, JUST SITTING IN THE DRIVE WAY. |

| 2017 | 06/23/2017 | WINDSHIELD DEVELOPED A CRACK WHICH STARTED EXPANDING RAPIDLY DUE TO HEAT. DEALER REP SAYS ITS DUE TO A ROCK HIT MAYBE BUT THE GLASS DOES NOT SEEM STRONG ENOUGH AS IT WAS THE FIRST BATCH OF PRIUS PRIMES RELEASED IN NOV 2017 AND I GOT MINE FROM THAT BATCH. |
|------|------------|---|
| 2017 | 08/01/2017 | DRIVING ON HIGHWAY AND A SMALL ROCK HIT THE OUTER EDGE OF MY WINDSHIELD AND WITHIN 5 MINUTES HAD AN 8 INCH CRACK AND BY THE END OF THE DAY IT HAS EXPANDED TO OVER 12 INCHES. CALLED TO HAVE FIXED AND WINDSHIELD HAS BEEN ON BACKORDER FOR OVER A MONTH. CAR IS ONKY 1 WEEK OLD! |
| 2017 | 08/01/2017 | I HAVE HAD THE PRIUS PRIME FOR ONLY FOUR MONTHS WHEN I WAS DRIVING TO WORK ON A HIGHWAY AND A SMALL ROCK HIT THE EDGE OF MY WINDSHIELD AND IMMEDIATELY LEFT A ONE FOOT CRACK. THERE WERE NO BIG TRUCKS OR BIG RIGS NEAR ME SO I'M NOT SURE WHERE THE ROCK CAME FROM. I READ THE PRIUS FORUMS AND FOUND OUT THAT THEY HAPPENS QUITE OFTEN TO PRIUS OWNERS AND TYPICALLY COSTS $1500 TOTAL TO REPLACE THE WINDSHIELD AND RECALIBRATE THE FORWARD-FACING CAMERA AT THE DEALERSHIP. I HAVE REQUESTED A QUOTE FROM SAFELITE AUTOGLASS AND WILL CALL MY AAA INSURANCE. I SURE HOPE THEY WILL COVER THE REPAIRS AS I DO NOT BELIEVE THIS IS IN ANY WAY MY FAULT. |
| 2017 | 08/02/2017 | A SMALL PEBBLE HIT MY WINDSHIELD BELOW THE INSPECTION STICKER. WITHIN SECONDS A CRACK STARTING DEVELOPING. WITHIN TWO MINUTES IT REACHED ALMOST HALFWAY ACROSS THE WINDSHIELD. I HAVE READ MANY COMPLAINTS ABOUT FRAGILE AND VULNERABLE PRIUS WINDSHIELDS. I BELIEVE TOYOTA NEEDS TO CORRECT THIS DEFECT, REPAIR MY WINDSHIELD AND PERFORM ANY NECESSARY RE-CALIBRATION. I HAVE UPLOADED TWO PICTURES. |
| 2017 | 09/07/2017 | JUST BOUGHT MY 2017 TOYOTA PRIUS NOT OVER 4 MONTHS AND MY WINDSHIELD HAVE 1 LARGE CRACKED AND A TINNY CHIPPED ON IT. AS I WAS DRIVING ON THE HIGHWAY CRACKED WHEN A TINY ROCK HIT THE UPPER RIGHT SIDE I COULD SEE THE CRACK GETTING LONGER UNTIL IT NEARLY |

| | | REACHED THE MIDDLE. I AM VERY WORRY ABOUT THE QUALITY OF THE WINDSHIELD BY THE 2017 TOYOTA PRIUS. |
|---|---|---|

### B.    Other Customer Complaints

100.    In addition to complaints made directly to Toyota by customers who tendered their vehicles to Toyota's authorized dealers for repair, Toyota routinely monitors the Internet, including vehicle-defect and Toyota-specific forums, for complaints similar in substance to those quoted below.  Upon information and belief, Toyota's Customer Service carries out this function and regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, Toyota was made aware of the Windshield Defect.  The complaints from carcomplaints.com, some of which are included below, also indicate Toyota's awareness of the defect and its potential danger, and many evidence Class members' efforts to contact Toyota directly concerning the Windshield Defect.

| Model Year | Complaint Date | Comments |
|---|---|---|
| 2016 | 03/01/2016 | I bought the car brand new and within a week of purchase, I had huge cracks going over the entire windshield and I immediately took it to the dealer I bought it from and they claimed that it was a rock that hit it but I never heard any rock hitting the windshield when I was driving it. I reported it to Toyota and they did nothing about it. I will never buy a Prius ever again |
| 2016 | 06/08/2016 | One very small pebble hit the windshield showing no damage until the next day...2 ft long crack that separates. Cheap glass that's expensive to replace. Toyota should recall theses windshields. |
| 2016 | 07/01/2017 | Bought the car in April. Within 2 weeks a pebble on the road hit the windshield resulting in a fast spreading crack. Because it's an OEM part it took several weeks to get a new windshield in to replace it. That was early May. By the end of May, a second tiny bit of road debris hit the windshield resulting in the same problem, fast spreading crack and long wait for new windshield. That windshield was replaced on June 29. On July 1, same thing again, tiny impact and fast spreading crack. My |

| | | |
|---|---|---|
| | | old 2010 Prius had these kind of pebble impacts all the time, never replaced a windshield - this is not just bad luck, this is poor quality glass |
| 2016 | 08/17/2017 | Windshield cracked for the second time. Never heard the rock hit but found the point of impact the next day. Crack was horizontal across 2/3rds of my windshield. |
| 2016 | 03/03/2017 | After I have my new Prius for two month, I was hit by a small tiny stone to the front window, then it started crack. I went to the Toyota then they said I need to pay 200$ retest of the cost will be covered by insurance. After two month with new window, it was hit by small stone again, I can't avoid small stone in the highway. It start crack again. Then I went to dealer to talk with them. They said if the stone was hitting edge of the window then the crack will happen easily. They suggested for me to change my window after winter. Therefore, I was waiting for May to come. Two weeks ago, I noted there was another crack starting happen with my window. I strongly believe they have a big issue with there design. Because in Sweden, there will be always small stone in the highway flying around. I had BMW before, and when I hit by stone nothing happened. This problem need to be reported and get attentions from Toyota. |
| 2016 | 03/15/2017 | Had the car for just about a year. It appears that a pebble may have hit the windshield, I can't be sure, though it may have also been a thermal issue. In any case, I noticed a small crack - long and thin, not circular like a stone - which increasingly got bigger literally every day of driving. After only a few weeks the crack is about 10-11 inches long. This is completely and utterly unacceptable to me. A large stone hitting it and making a big circular crack that eventually spiders out? Yes, that's just bad luck. But this is clearly poor glass. There is no acceptable reason this crack should have started and it certainly shouldn't be getting half an inch larger nearly every day. This was quoted as a $900 repair at minimum and I have no faith based on other similar complaints found elsewhere on the internet that I won't have the same problem again. I called the dealer and they informed me that this would not be covered under warranty in any case, but I will continue to report it to them and to Toyota until this gets properly addressed. I have been a loyal Toyota customer for 15 years, now on my 4th Prius, but if they don't back up the quality of every part of their vehicle - especially one which this level of expense - then my next car will not be one from Toyota. |

| 2016 | 06/21/2017 | I bought this car used, drove about 1K, and then a very tiny pebble hit it to start crack about half inch, but after that, about 2 inches per day getting worse. Toyota should recall the part. Thx |
| 2016 | 07/06/2017 | My windshield cracked for the fourth time. Never heard the rock hit. I have to replace this glass now with 3 big cracks. I've been afraid to replace it. Glad I didn't after the second crack. I could have put 3 windshields in this car and it only has 16,900 miles. There is a real design flaw in the shape of the glass or toyota made the windshield too thin to save weight for the hybrid. These windshields cost $1300 to buy outright and nobody makes an aftermarket that I can locate. |
| 2016 | 08/08/2017 | A small rock hit the windshield causing a crack not more than the size of a quarter. Thought we could get it filled in, but then overnight it spread into a long crack across the windshield. I believe the window is too thin and lightweight. Side window had a crack from a rock too. This is too much. Think a design flaw was made here. |

101.    Further complaints were found on priuschat.com, an online forum covering all topics related to the Toyota Prius. The complaints from priuschat.com, some of which are included below, also indicate Toyota's awareness of the defect and its potential danger, and many evidence Class members' efforts to contact Toyota directly concerning the Windshield Defect.

| Model Year | Complaint Date | Comments |
|---|---|---|
| 2016 | 03/30/2016 | Hello, I'm new here! I purchased my 2016 Prius in Feb, and somehow managed to get a crack in my windshield that grows a few inches per day. Today I called the Toyota dealership to check if any of the warranties I purchased would cover it. They don't. So I asked how much it would be to replace.....$1359 PLUS labor!!!!!! Granted I was driving a '98 Honda before, but holy moly!!!!!! |
| 2016 | 04/06/2016 | My 2016 Prius got hit near the edge (1/4in from side) of the front windshield by a small stone and left a 6.5in crack. It was not a huge dent in the glass. I've had a number of stones hit my 2005 Prius and none had basically destroyed the front windshield. First pebble to the 2016 and poof. Am I unlucky or are these really thin? Also, does anyone with a 2016 hear a crack sound from their windshield on cold days? I would hear something that made me imagine there was something thermally causing a shift/crack noise I could hear. It was |

| | | |
|---|---|---|
| | | routine enough that I mentioned it in the Toyota survey weeks before my crack, but never heard back from Toyota. BTW, in one day the crack has grown to over a foot in length right in front of driver view. I have a 4 Touring without HUD. My quote for glass, gaskets and install was about $1500 with Toyota glass (a glass shop didn't even have cheaper glass for the 2016 available yet). Had the car for only like 2 months and I think it's only been filled up 3 times. Anyone else with windshield problems please post. |
| 2016 | 04/11/2016 | Windshield seems to be made out of butter. Found a few pits on wife's windshield already. Not chips but pitting like craters. |
| 2016 | 06/20/2016 | Man oh man! I bought a 2016 Prius Three Touring a month ago and tonight got an 8 inch crack on my windshield. I'm getting from a rock. Really depressing. Replacement out of pocket is ridiculous. I called Toyota and Safelite, both about the same price $1500+. <br><br> I also own a 2004 Prius and have had a million rocks hit the windshield but none of them has left a crack like this. <br><br> This is very depressing and the GSWarriors lost today. |
| 2016 | 09/04/2016 | Hello, I'm new to the forum, but this is our 3rd Prius. Our 2016 Prius III developed a small horizontal crack on the windshield starting on the passenger side. I drove back from Austin, TX a week prior to the beginning of the crack. It started very small, but in 3 days had spread to the driver's side. There are no points of impact. Called the local dealer in Phoenix, they recommended their glass installing company, who coordinated the claim with state farm. Has to be OEM, as there are no generic windshields yet. I had read on another forum of the same problem with the windshield here in Arizona, and thought perhaps our extreme heat was a factor. We have a carport in Phoenix, garage in Austin. Windshield was supposed to be delivered and installed today, but they ordered a Prius C windshield. Now waiting on delivery from California as the windshield is on national backorder. This is the noisiest Prius we have owned. Maybe a new windshield will help, but I sincerely believe the windshields are defective. We had a 2006 with over 180k miles that in 10 years of long and short distance driving had a small chip which was repaired, and our 2011 with 88k miles doesn't have any chips or cracks. State farm will pay for OEM if other options are not available. |
| 2016 | 01/13/2017 | I strongly suspect that there is a problem with the windshields of recent Prii (or Priuses, if you prefer). I just found another crack in mine and it was in a replacement windshield for a large crack that occurred in my 2016 4 Touring 5 months ago. |

| | | |
|---|---|---|
| | | I recently saw another 2016 Prius in a local parking lot with a large crack. I have been driving for about 50 years and these are my first encounters with such fragile windshields. My 2011 Prius did not have this problem. State Farm Insurance paid the full price ($1,300) to replace the first windshield. They may not be willing to do that again (I'm almost afraid to report it). Obviously, Toyota needs to acknowledge the problem and correct it. I love my car, but... |
| 2016 | 1/17/2017 | I don't mean to revive an old thread, but add me to the unlucky list. 4,000 California urban miles in 3 months for the 2016 Prius for me and in the last two weeks, I've had 2 chips. I repaired the first one with cured resin only to get chipped again a second time. The first time I was going probably 65-70mph staying about 3 seconds behind a mid sized pick up truck when it happened. The second time I was going 50mph about 5 seconds behind a Prius. I'm afraid to drive fast or get anywhere close to another car now. I've driven the old '98 Camry this same route for 5 years with no chips. |
| 2017 | 06/08/2017 | We purchased a 2017 Prius 3 touring late December 2016 in the following 5 months we had 3 cracked windshields from rock chips that went immediately to a long crack. The last chip (in May 2017) was delayed for repair because there were 9 replacement windshields back ordered. I would guess there were more than 9 broken windshields since all suppliers in our area had no inventory. This is our 3rd prius and we had no problems with any of them. In every other way, the 2017 is a great car however, I am wondering if the windshield is now made with thinner glass or the new aerodynamics is creating a air channel to hit the windshield. Does anyone else have this same problem? Would a bug deflector create a different aerodynamic that would alleviate this problem? |
| 2017 | 07/11/2017 | Mine just broke. First window I have ever broken. Toyota says it will be over a month because they are back ordered. They also mentioned the recalibration. |
| | 07/25/2017 | So its for sure a problem, Our dealer said they are backordered nationwide for 3-4 months ( windows are still in manufacturing) and then will be giving priority to those that are not drivable, ( i.e.: accidents or hail damage.) Has already been 3 weeks today. Crack has now gone all the way across window. Really sucks! Also can only be replaced with a Toyota window, No aftermarket windows exist yet. |
| 2016 | 07/12/17 | About a month ago while in Texas, My 2016 Prius was hit by a rock and made a small star. Less than 1/2 inch across. By the |

| | | |
|---|---|---|
| | | next day, three cracks appeared and within 24 hours had spread all the way across the windshield. Took it to the dealer.It took a couple of weeks to get a replacement windshield in. They used safelite to install and the camera had to be reprogrammed. All toll took 2 days to complete.<br><br>It semms like there it undue pressure on the windshield that would make it crack that way. |
| 2017 | 07/27/2017 | Hello. I have a 2017 prius as well. had small stone clip corner of window then a large crack occurred across it. Cost was $910 with a $500 deductible. This is the first crack I have ever had. This is my 7th prius with no problems on the others. Must be a glass problem. |
| 2016 | 06/10/2017 | I agree the car has an inferior windshield wrt cracking. Two weeks ago a rock hit mine and it shattered. I contacted Toyota, and posted on another windshield thread here at priuschat. Toyota agreed with me and helped cover the cost but I took a fair amount of ribbing here |

## C.    Other sources of Knowledge

102.    Toyota is experienced in the design and production of consumer vehicles.  As experienced manufacturers, Toyota conducts testing on incoming batches of components, including windshields, to verify that the parts are free from defects and comply with Toyota's specifications.  Accordingly, Toyota knew or should have known that the windshields used in Class Vehicles are defective and prone to crack, costing Plaintiffs and Class members thousands of dollars in replacement costs.

103.    Moreover, Toyota conducts significant durability testing on all of its vehicles, including Class Vehicles, through which Toyota learned or should have learned about the Windshield Defect.  For example, Toyota conducts "Rough Road Durability Testing" on all new vehicles, in which Toyota "recreat[es] poor road conditions akin to those that exist around the world" and asks three drivers to drive vehicles 900 km in a single day "under the harshest, most

adverse driving conditions."[13]   In light of Class member claims that infinitesimal pebbles often cause Vehicle windshields to crack, Toyota should have learned of the Windshield Defect during Rough Road testing.

104.    Toyota also conducts environmental testing "in facilities that can recreate the extreme cold and searing heat of different regions of the world . . . to ensure that Toyota can make cars that will remain comfortable for passengers even under such conditions."[14]

105.    Toyota's extensive crash testing also should have revealed the Windshield's susceptibility to cracking.  "Toyota performs more than 1,600 tests using actual vehicles (all are brand new cars) each year (including tests at other collision test sites).  This means that on average, more than four tests are conducted each day. The vehicles used in the tests are destroyed, but by performing the tests over and over again, Toyota is able to extract valuable information under various conditions."

106.    Moreover, Toyota also should have known of the Windshield Defect due to the sheer number of reports of cracked windshields in Class Vehicles and the high number of replacement windshields being ordered from Toyota.  Because of the high number of Class members ordering replacement windows Toyota, its dealerships and services centers are experiencing a backlog of windshield replacements, and are unable to repair Class Vehicles in a timely manner.  Many Class members must wait months to have their windshields replaced.

107.    On information and belief, Toyota also interacts with its authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues.  Toyota collects and analyzes field data including, but not limited to, repair

---

[13]     http://www.toyota-global.com/innovation/quality/road-in-the-world/ (last visited November 2, 2017).
[14]     http://www.toyota-global.com/innovation/quality/vast-test-site/ (last visited March 1, 2018, November 2, 2017).

requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data, all of which alerted it to the Defect's existence.

108. The timing of the aforementioned complaints, coupled with the other means through which Toyota monitors vehicle performance, clearly establish that Toyota had knowledge of the Windshield Defect prior to the time of sale of all Class Vehicles.

109. Despite its longstanding knowledge of the Windshield Defect, Toyota did not disclose the Defect's existence to Plaintiffs or Class members, either in advertising, at the point-of-sale, or after purchase. Toyota has not recalled Class Vehicles, issued a Technical Service Bulletin alerting authorized technicians to its existence and informing them to repair Class Vehicles at no charge to vehicle owners, or even informed Class members of the Defect's existence and the serious and unjustifiable safety risks it imposes upon them.

## CLASS ALLEGATIONS

110. Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3).

### Nationwide Class:

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

111. Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiffs also seek to represent the following "State Subclasses." The State Subclasses consist of each of the following:

### California Subclass:

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle used primarily for personal, family or household purposes, as defined by California Civil Code § 1791(a).

**Rhode Island Subclass:**

All persons or entities in Rhode Island who are current or former owners and/or lessees of a Class Vehicle used primarily for personal, family or household purposes.

**Washington Subclass:**

All persons or entities in Washington who are current or former owners and/or lessees of a Class Vehicle used primarily for personal, family or household purposes.

112.    Pursuant to Federal Rule of Civil Procedure, Rule 23(c)(5), Plaintiffs Squires, Badke, Viscardi, and Nidever seek to represent the following subclass regardless of whether the Nationwide Class is certified:

**Warranty Denial Subclass:**

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle and who were denied warranty coverage for repairs to or replacement of the windshield despite presenting their vehicle to Toyota for repairs within the duration of the three-year/36,000 mile New Vehicle Limited Warranty period or any other extended warranty plan sold by Defendants.

113.    The Nationwide Class, the Warranty Denial Subclass and the State Subclasses shall be collectively referred to herein as the "Class." Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

114.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Toyota and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis

allege, that hundreds of thousands of Class vehicles have been sold and leased in each of the States that are the subject of the Class.

115.    <u>Existence and Predominance of Common Questions of Fact and Law</u>:  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to whether

a.    The Class Vehicles were sold with a Windshield Defect;

b.    Toyota knew of the Windshield Defect but failed to disclose the problem and its consequences to its customers;

c.    a reasonable consumer would consider the Windshield Defect or its consequences to be material;

d.    Toyota has failed to provide free repairs as required by its New Vehicle Limited warranty;

e.    Toyota's conduct violates the state statutes described below.

116.    <u>Typicality</u>:  All of the Plaintiffs' claims are typical of the claims of the Class since each Plaintiff purchased a Class Vehicle with the Windshield Defect, as did each member of the Class.  Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Toyota's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

117.    <u>Adequacy</u>:  All of the Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained counsel competent and highly experienced in complex consumer class action litigation, and they intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

118.    Superiority:    A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class Member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Toyota's conduct.  It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Toyota's vehicle identification numbers, warranty claims, registration records, and database of complaints.

119.    Toyota has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

**(By Plaintiffs Squires, Badke, Nidever, and Viscardi on Behalf of the Warranty Denial Subclass, or, Alternatively, the State Subclasses)**

120.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

121.    Plaintiffs bring this claim on behalf of themselves and the Warranty Denial Subclass.

122.     Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.  Accordingly, Defendants' warranties are express warranties under state law.

123.     The materials affected by the Windshield Defect were manufactured and incorporated into Class Vehicles by Defendants, and covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

124.     Defendants breached these warranties by selling and leasing Class Vehicles with the Windshield Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

125.     Plaintiffs notified Defendants of the breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile.  Defendants also know of the Windshield Defect and yet have chosen to conceal it while refusing to comply with their warranty obligations.

126.     As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members incurred substantial repair costs for which Defendants should have borne responsibility pursuant to the terms of their express warranties.

127.     Plaintiffs and members of the Warranty Denial Subclass have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

### SECOND CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

### (By Plaintiffs Squires, Badke and Viscardi on Behalf of the Nationwide Class or, Alternatively, the State Subclasses)

128.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

129.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of Class Vehicles.  Defendants knew or had reason to know of the ordinary purpose for which Class Vehicles were purchased.

130.    Defendants provided Plaintiffs and the other Class members with an implied warranty that Class Vehicles and any components thereof are merchantable and fit for the ordinary purposes for which they were sold.  However, Class Vehicles were not and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation, either at the time of sale or thereafter, because *inter alia*, Class Vehicles suffered from the Windshield Defect at the time of sale.  Class Vehicles cannot be safely operated without a windshield that is free from defects, thus Class Vehicles are not fit for their ordinary purpose of providing safe and reliable transportation.

131.    Defendants impliedly warranted that Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (i) a warranty that Class Vehicles manufactured, supplied, distributed, and/or sold by Defendants are safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their ordinary use while the Class Vehicles were being operated.

132.    Defendants' actions as complained of herein breached the implied warranty that the Class Vehicles were and are of merchantable quality and fit for ordinary use.

133.    Plaintiffs and Class members are intended third-party beneficiaries of contracts, including express warranties, between Defendants and their authorized dealerships, representatives and agents.  On information and belief, Defendants' authorized dealerships, representatives, and agents purchased Class Vehicles from Defendants pursuant to valid and enforceable agreements.  Because Plaintiffs and Class members—rather than Defendants' authorized dealerships, representatives, and agents—were the intended end users of Class Vehicles, Plaintiffs and Class members were the intended (and not incidental) third party beneficiaries of the agreements entered into among Defendants and authorized dealerships, representatives, and agents, and any warranties, express or implied, flowing therefrom. Indeed, Defendants' authorized dealerships, representatives, and agents did not and would not purchase Class Vehicles for personal use, therefore the implied warranties flowing to them actually are intended to protect their customers from the losses Class Products have and will continue to cause them.  Accordingly, Defendants are estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

## <u>THIRD CAUSE OF ACTION</u>

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT

### 15 U.S.C. § 2301, *et seq.*

**(By Plaintiffs Squires, Badke, Nidever, and Viscardi On Behalf of the Nationwide Class)**

134.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

135.    Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

136.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

137.    Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

138.    Toyota's New Vehicle Limited three years/36,000 miles basic warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

139.    Defendants breached these written warranties as set forth above.

140.    Defendants' breach of the express warranty has deprived the Plaintiffs and the other Class members of the benefit of their bargain.

141.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum or value of $25.  In addition, the amount in controversy meets or exceed the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

142.    Defendants have been afforded a reasonable opportunity to cure their breach of the written warranty and/or Plaintiffs and the other Class members were not required to do so because affording Defendants a reasonable opportunity to cure its breaches would have been futile. Defendants were also on notice of the Windshield Defect from the complaints and service requests it received from Class members, as well as from its own warranty claims, customer complaint data, and/or parts sales data, and the results of internal pre- and post-sale quality and durability testing.

143.    At the time they issued written warranties for Class Vehicles, Defendants also knew and had notice that Class Vehicles suffered from the Defect alleged herein. Defendants' continued misrepresentations and omissions concerning Class Vehicles and the Defect, as well as Defendants' failure to abide by their own written and implied warranties, are "[u]nfair methods of

-45-

competition in or affecting commerce, and [are] unfair or deceptive acts or practices in or affecting commerce." Accordingly, Defendants' behavior is unlawful under 15 U.S.C. §§ 2310(b), 45(a)(1).

144.    As a direct and proximate cause of the conduct alleged herein, Plaintiffs and the other Class members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and other Class members, who are entitled to recover actual damages, consequential damages, specific performance, and costs, including statutory attorneys' fees and/or other relief as deemed appropriate.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE
### CAL. BUS. & PROF. CODE § 17200
### (By Plaintiffs Khalil and Nidever on Behalf of the California Subclass)

145.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at herein.

146.    Plaintiffs Khalil and Nidever ("Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and the California Class.

147.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

148.    Defendants have engaged in unfair competition and unfair, unlawful and/or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and Class members that Class Vehicles suffer from the Windshield Defect (and the costs, safety risks, and diminished value of the vehicles associated therewith). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Windshield Defect, and Plaintiffs and Class

-46-

members could not reasonably have been expected to learn or discover the true facts related to the Defect.

149.    The Windshield Defect constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers as set forth above.

150.    These acts and practices are fraudulent because they have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the Defect and suppressing other material facts from Plaintiffs and the Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

151.    The injuries suffered by Plaintiffs and the Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiffs and the Class members should have reasonably avoided.  Therefore Defendants also have engaged in unfair practices.

152.    Defendants' acts and practices also are unlawful because they violate California Civil Code sections 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code section 2313.

153.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitution and disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business and Professions Code section 17200.

## FIFTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")

### Cal. Civ. Code § 1750, *et seq.*

### (By Plaintiffs Khalil and Nidever on Behalf of the California Subclass)

154.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

155.    Plaintiffs Khalil and Nidever ("Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and the California Class.

156.    Defendants are "persons" as that term is defined in California Civil Code section 1761(c).

157.    Plaintiffs and the Class are "consumers" as that term is defined in California Civil Code section 1761(d).

158.    Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above.  Defendants knowingly and intentionally concealed from Plaintiffs and Class members that Class Vehicles suffer from the Windshield Defect (and the costs, risks, and diminished value of the vehicles as a result of this problem.)

159.    The acts and practices complained of herein violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

-48-

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

160.    In the course of their business, Defendants repeatedly and regularly engaged in unfair and/or deceptive acts and practices that were capable of deceiving (and did deceive) a substantial portion of the purchasing public, and imposed a serious safety risk thereon.

161.    Defendants knew that Class Vehicles and the windshields installed therein were defectively designed and/or manufactured, would fail prematurely, and were not suitable for their intended use.

162.    Defendants were under a duty to Plaintiffs and the Class to disclose the defective nature of Class vehicles due to the Windshield Defect because:

   a.    Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in Class Vehicles;

   b.    Plaintiffs and Class members would not reasonably have been expected to learn or discover that Class Vehicles suffered from a dangerous safety defect until the Windshield Defect actually manifests;

   c.    Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs necessitated thereby until the manifestation of the Windshield Defect; and

   d.    Defendants actively concealed the safety and security defect and the associated repair costs by claiming the Windshield Defect does not exist and, in many cases, repairing Class Vehicles using similarly defective windshields.

163.    In failing to disclose the Windshield Defect and the safety risks and repair costs associated therewith, Defendants knowingly and intentionally concealed material facts from Plaintiffs and the Class, and breached their duty not to do so.

164.    The facts Defendants misrepresented, and concealed or failed to disclose, to Plaintiffs and the Class are material in that a reasonable consumer would have considered them

important in deciding whether to purchase Class Vehicles or pay a lesser price.  Had Plaintiffs and the Class known of the defective nature of Class Vehicles, they would not have purchased Class Vehicles, would have paid less for them or would have avoided the extensive repair costs associated therewith.

165.    Under California Civil Code section 1780(a), Plaintiffs and members of the Class seek injunctive and equitable relief for Toyota's violations of the CLRA. After mailing appropriate notice and demand under California Civil Code section 1782(a) & (d), Plaintiffs subsequently will amend this Complaint to also include a request for damages.

166.    Plaintiffs and the Class therefore also request this Court enter such orders or judgments necessary to restore to any person any money acquired with such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in Civil Code section 1780 and the Prayer for Relief.

## SIXTH CAUSE OF ACTION
### VIOLATIONS OF THE SONG-BEVERLY ACT
### CALIFORNIA CIVIL CODE §§ 1792, 1791.1, *et seq.*
**(By Plaintiff Khalil and Nidever on Behalf of the California Subclass)**

167.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

168.    Plaintiffs Khalil and Nidever ("Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and the California Class.

169.    At all times relevant hereto, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles.  Defendants knew or should have known of the ordinary and intended purpose for which Class Vehicles are purchased.

170.   Defendants impliedly warranted to Plaintiffs and the Class that Class Vehicles, and any components thereof, are merchantable and fit for their ordinary and intended purpose: providing safe and reliable transportation.   This implied warranty included, *inter alia*, the following: (i) a warranty that Class Vehicles, including their windshields, were manufactured, supplied, distributed, and/or sold by Toyota, were safe and reliable, and able to withstand the ordinary and foreseeable stresses to which vehicles are exposed during operation; and (ii) a warranty that the Class Vehicles were fit for their ordinary and intended use, i.e., providing safe and reliable transportation while in operation.

171.   Contrary to the applicable implied warranties, however, Class Vehicles are not fit for their ordinary purpose of providing safe and reliable transportation because of the Defect.

172.   Defendants breached the implied warranties applicable to Class Vehicles at the time of sale because the Defect was latent at the time Plaintiffs and Class members purchased their vehicles.

173.   Through the actions complained of herein, Defendants breached their implied warranty that Class Vehicles were of merchantable quality and fit for such use in violation of CAL. CIV. CODE §§ 1792 and 1791.1.

## SEVENTH CAUSE OF ACTION

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT

#### Wash. Rev. Code § 19.86.010, *et seq.*

#### (By Plaintiff Viscardi on Behalf of the Washington Subclass)

174.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

175.   Plaintiff Viscardi ("Plaintiff" for purposes of this Count) brings this claim on behalf of himself and the Washington Class.

4543224.1

176.     Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Wash. Rev. Code § 19.86.020.

177.     The actions of Defendants, as set forth above, occurred in the conduct of trade or commerce.

178.     Defendants, in the course of their business, misrepresented the attributes and performance properties of Class Vehicles with respect to the safety thereof, willfully failed to disclose the dangerous risk of the Defect in the Class Vehicles as described above, and actively concealed the Defect from Plaintiff and Class members by affirmatively asserting that the windshields installed in Class Vehicles failed due to ordinary wear rather than the Defect alleged herein, and by subsequently replacing failed windshields with similarly defective replacement parts.  Accordingly, Defendants, through the various misrepresentations and omissions described herein, engaged in unfair and deceptive acts or practices.

179.     Defendants should have disclosed the true nature of the Defect in Class Vehicles because they were in a superior position to know them, and Plaintiffs and Class members could not reasonably be expected to learn or discover them.  Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiffs and the Class members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).

180.     These acts and practices have deceived Plaintiff and are likely to, and did, deceive the public.  In misrepresenting the attributes and performance properties of Class Vehicles, and failing to disclose the Defect and suppressing material facts from Plaintiff and Class members, Defendants violated the WCPA and injured Plaintiff and the Class.    Defendants'

misrepresentations, omissions and acts of concealment pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

181.    The injuries suffered by Plaintiff and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, and are not injuries that Plaintiff and Class members should have reasonably avoided.

182.    Defendants' conduct proximately injured Plaintiff and other Class members.  Had Plaintiff and the Class known of the defective nature of the Class Vehicles, they would not have purchased Class Vehicles, would have paid less for them or would have avoided extensive repair costs.

183.    Pursuant to Washington Revised Code section 19.86.090, Plaintiff requests that the Court grant treble damages.

### SEVENTH CAUSE OF ACTION

**VIOLATIONS OF THE RHODE ISLAND DECEPTIVE**

**TRADE PRACTICES ACT**

**R.I. Gen. laws § 6-13.1-1, *et seq.***

**(By Plaintiff Badke on Behalf of the Rhode Island Subclass)**

184.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

185.    Plaintiff Badke ("Plaintiff" for purposes of this Count) bring this claim on behalf of himself and the Rhode Island Class against all Defendants.

186.    The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. ("DTPA") declares unlawful any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

187.    The actions of Defendants, as set forth above, occurred in the conduct of trade or commerce.

188.    Defendants, in the course of their business, misrepresented the attributes and performance properties of Class Vehicles with respect to the safety thereof, and willfully failed to disclose and actively concealed the dangerous risk of the Defect in the Class Vehicles as described above.  Accordingly, through the misrepresentations, omissions and acts of active concealment described herein, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in the DTPA, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

189.    Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this Defect.  Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiffs and the Class members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).

190.    These acts and practices have deceived Plaintiff and are likely to, and did, deceive the public.  In misrepresenting the attributes and performance properties of Class Vehicles, and failing to disclose the Defect and suppressing material facts from Plaintiff and Class members, Defendants violated the DTPA and injured Plaintiff and the Class.    Defendants' misrepresentations, omissions and acts of concealment pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

191.    The injuries suffered by Plaintiffs and the Class are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class should have reasonably avoided.

192.    A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class.  Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them or would have avoided extensive repair costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.    appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

E.    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Windshield Defect;

F.    award reasonable attorneys' fees and costs; and

G.    grant such further relief that this Court deems appropriate.

4543224.1

Dated:  March 1, 2018.

Respectfully submitted,


By: /s/ William B. Chaney
        WILLIAM B. CHANEY
        State Bar No. 04108500
        ANDREW K. YORK
        State Bar No. 24051554
        JIM MOSELEY*
        State Bar No. 14569100

**GRAY REED & MCGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, Texas  75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
E-Mail:  wchaney@grayreed.com
        dyork@grayreed.com
        jmoseley@grayreed.com

DANIEL O. HERRERA*
State Bar No. 6296731
JOHN SCHEFLOW*
State Bar No. 6317115
150 S. Wacker, Suite 3000
Chicago, Illinois  60606
Telephone:  (312) 782 4880
Facsimile:  (312) 782-4485
Email:  dherrera@caffertyclobes.com
       jscheflow@caffertyclobes.com

BRYAN L. CLOBES*
State Bar No. 68151
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
1101 Market Street, Suite 2650
Philadelphia, Pennsylvania  19107
Telephone:  (215) 864-2800
Facsimile:  (215) 964-2808
Email:  bclobes@caffertyclobes.com

---

\*     These attorneys have submitted, or will be submitting, applications for pro hac vice admission.

JOSEPH G. SAUDER[*]
State Bar No.
MATTHEW D. SCHELKOPF[*]
State Bar No. 89143
JOSEPH B. KENNEY[*]
State Bar No. 316557
**MCCUNE WRIGHT AREVALO LLP**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
Facsimile: (610) 727-4360
E-Mail: jgs@mccunewright.com
        mds@mccunewright.com
        jbk@mccunewright.com

*Counsel for Plaintiffs and the Putative Class*

## JURY DEMAND

    Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

/s/ William B. Chaney
WILLIAM B. CHANEY
ATTORNEYS FOR PLAINTIFFS AND
PUTATIVE CLASSES